WILLIAM M. NARUS, CAB #243633
Acting United States Attorney
District of Oregon
GREGORY R. NYHUS, ORB #913841
Greg.R.Nyhus@usdoj.gov
MIRA CHERNICK, MSB #696845
Mira.Chernick@usdoj.gov
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204-2902
Telephone:  (503) 727-1000
Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | No. 25-cr-131-IM |
| v. | **GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION** |
| **JASON DAVID CAMPOS**, | |
| **Defendant.** | |

Defendant Jason David Campos stalked and harassed the victim in this case for over a decade, stopping only when he was incarcerated for the attempted rape of another stalking victim and resuming as soon as he was released on supervision. He now faces significant penalties for his conduct, including a mandatory two-year consecutive sentence. There is a serious risk that he will fail to appear or attempt to obstruct justice, and he is a danger to the community.  Defendant should be detained pending trial.

**Government's Memorandum on Detention**                                                                                                 **Page 1**

I.     **LEGAL STANDARD**

Pursuant to the Bail Reform Act of 1984, the court shall hold a detention hearing "in a case that involves [either] a serious risk that [the defendant] will flee; or a serious risk that [the defendant] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness." 18 U.S.C. § 3142(f)(2).  If, after a detention hearing, the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer *shall order* the detention of the person before trial." 18 U.S.C. § 3142(e)(1) (emphasis added). The Ninth Circuit has held that detention is appropriate where a defendant is either a danger to the community or a flight risk; the government need not prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). The United States is permitted to proceed by proffer and to submit hearsay evidence with respect to issues of detention. *See United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986) (citing cases).

II.     **FACTUAL BACKGROUND**

*Defendant's Prior Burglary Conviction*

On August 13, 2016, defendant was arrested in California for breaking into the home of a woman whom he had been stalking.  The 21-year-old victim woke up shortly before 1 a.m. to the sound of defendant entering her apartment.  He broke in through a rear sliding door with a faulty lock, passed through the living room, where he picked up a blanket from the couch, and entered the bathroom next to the victim's bedroom.  The victim jumped out of bed and went to her bedroom door.  When she opened the door, she saw defendant standing in the bathroom doorway directly in front of her.  Defendant threw the blanket over her head and ran at her before turning and running out of the apartment.

**Government's Memorandum on Detention**     **Page 2**

Defendant had previously been stopped for prowling near the victim's apartment and peeping through her window about four months earlier; on that occasion, he was wearing dark clothing and carrying duct tape and a makeshift ski mask. Women's underwear was found in defendant's car. Police had to return after their initial contact with him because he waited for them to leave and then returned to peeping in the victim's apartment.

After breaking into the victim's apartment, defendant was found at a bar nearby. He was interviewed by police and changed his story several times as the officers confronted him with various pieces of evidence. He eventually admitted to entering the victim's apartment to have sex with her, but claimed that he was responding to an ad she had posted on Craigslist's "Casual Encounters" section inviting strangers over for sex. He could not show officers the Craigslist post he was supposedly responding to, and no evidence of any such internet activity was found on the victim's phone. Defendant's car was searched and found to contain a roll of duct tape and five pairs of women's underwear.

Defendant was arrested and charged with assault with intent to commit rape, first degree burglary, and attempted first degree burglary in violation of California law. While those charges were pending, defendant was arrested and cited for violation of a California law that prohibits owning or possessing a firearm if a person is prohibited from doing so by a court order, injunction, or protective order. He eventually pled guilty to the state charges and was sentenced to four years in prison. He was released on parole on December 14, 2019, and completed his parole on December 23, 2021.

*Defendant's Cyberstalking of Adult Victim 1*

The approximately two years that defendant spent in custody provided Adult Victim 1 (AV1) only a temporary reprieve from the revenge porn, harassment, and cyberstalking that

**Government's Memorandum on Detention**                                                                 **Page 3**

defendant had subjected her to since 2009. AV1 was in a romantic relationship with defendant in the early 2000s, when she was in her early 20s. During that relationship, she allowed defendant to take nude pictures of her, which he stored on his laptop. The relationship ended amicably in 2008. The following year, AV1 searched for her own name on the internet and discovered the nude images of herself posted on Facebook, Craigslist, Classmates.com, in sex ads, and on a Swedish website. The images were often posted by accounts using her own name, including her maiden name.

Defendant's campaign of harassment and humiliation against AV1 persisted for years. On April 22, 2012, defendant created an account displaying AV1's legal name—first and last—on the website "cumonprintedpics.com." Over the following seven years, he used that account to make 46 posts to the website. In these posts, defendant shared nude images of AV1 without her consent, accused her of infidelity, called her a "bitch" and a "whore," and encouraged strangers on the internet to masturbate on images of her and to scare and harass her.

On May 10, 2013, he made a post titled "San Jose Whore [AV1's first and last name]," which contained a photograph of AV1 nude from the waist down with the caption, "This bitch deserves to get all the cream you can muster. She cheater (sic) on me with her current boyfriend and now shes cheating on him with me. Post your creamed pics of her here and email them to her current boyfriend [email address]." The post was viewed over 700 times. That same year, AV1's then-fiancé received a harassing email containing a nude photo of AV1.

On May 17, 2020, after he was released on parole from his sentence for burglary and assault with intent to commit rape, defendant made another post titled "Public Shame [AV1's first and last names]" that contained several photographs, which were not viewable at the time law enforcement reviewed the post in February of 2022. Defendant commented on the post, "This cheating slut

**Government's Memorandum on Detention**                                                                                           **Page 4**

deserves to be shared with the world. Email her and tell her what you'd do to her. I'll give social media to anyone who posts her replies here. Scare her, BM [blackmail] her, do whatever you want. This bitch has it coming. Her email is [AV1's email address]." A response to the post contained a nude image of AV1. The next day, defendant left another comment on the post: "This bitch still hasn't figured it out. Keep it going guys. Shes freaking out lol. Took down her socials though. Gonna have to find another way to get at her."

On August 11, 2020, while still on parole from his state conviction, defendant made another post with the file name "[AV1's first and last name].jpg," which contained 20 images of AV1 nude and in various poses. The title of the post was "Cum o[n] fake [AV1 first and last name]" with the caption "[AV1] needs to see herself cocked and covered in cum. Can't wait to see your work!"

On July 16, 2021, defendant created an email account in AV1's name. A month later, while still on state supervision from his previous conviction, defendant used the account to email an attorney in Oregon who was assisting AV1 with her divorce. Defendant, impersonating AV1 through the email account, requested AV1's client file, which contained personal information about AV1, including her home address and information about her minor child. The attorney, believing that he was communicating with AV1, sent the client file. Defendant responded by emailing the attorney nude images of AV1. In July of 2022, he emailed the attorney again to ask if he would like more nude photographs of AV1. In addition to these contacts, the attorney reported to law enforcement that a friend of AV1 had provided him with a link to a post from approximately August 2, 2021, in which the same email that was used to email the attorney in AV1's name had been used to post several images of AV1 to a chat or message board. The post accurately stated that AV1 was from a specific city in Oregon and lived in a specific neighborhood there, and stated,

"Anyone up to print these [photographs] out and post them around the area? Above urinals, at stop lights, even on those community boards. Take a picture of your work and send me the location."

After obtaining her personal information—including information about her minor child—from her attorney, defendant contacted AV1 directly. On January 23, 2022, AV1 received an email at her personal email address from the sender "milkmustache@protonmail.com," which investigators later linked to defendant. The message referred to her minor child by name and asked her whether she was the child's mother.

Defendant's harassment of AV1 persisted into 2023. In January of 2023, defendant repeatedly visited posts he had previously made containing AV1's name and images on cumonprintedpics.com. He also impersonated AV1 on the social media application Kik in February of 2023, using an account in her name to send nude images of her to two separate male Kik users, encouraging them to masturbate on the photos, and instructing them to email AV1 at the email address defendant had previously known her to use.

Later that month, on February 28, 2023, federal agents executed a search warrant at defendant's house. Defendant claimed not to be familiar with the email service provider "Protonmail," which he had used to set up two of the offending email accounts. He also claimed not to have heard of "cumonprintedpics.com." When his laptop was searched pursuant to the warrant, the login page for Protonmail was found in defendant's web history. Investigators also found artifacts on the laptop showing that a specific IP address was used on that laptop; that same IP address was also used to create a post on the "cumonprintedpics" website on December 17, 2021, which contained two nude photographs of AV1.

Defendant's cell phone, which was seized from him pursuant to the federal search warrant in February of 2023, was initially unable to be searched. In March of 2025, due to technological

**Government's Memorandum on Detention**                                                                 **Page 6**

advancement, investigators were able to access the device pursuant to a new search warrant. That search revealed that defendant searched for the phrase "[AV1] naked" 28 times between January 8, 2023 and February 28, 2023. The last time defendant searched for this phrase was the morning the search warrant was executed. The email account in AV1's name that defendant used to fraudulently access her personal information and legal documents was found on the phone, as was the Kik account in AV1's name. Investigators also found 28 photographs of erect penises and/or semen on printed pictures or phones displaying nude photographs of AV1 on defendant's phone.

Due to defendant's relentless campaign to harass, threaten, and publicly humiliate her over the course of a decade, AV1 developed anxiety, moved every year, was afraid to use computers, worried about her employment, and feared for her own safety and the safety of her family.

*Procedural History*

Following the search warrant at defendant's residence in early 2023, the government engaged in extensive negotiations with defendant regarding a potential pre-indictment resolution in the case. Through counsel, defendant consistently expressed interest in such a resolution. The government produced significant pre-indictment discovery to defense counsel and negotiated the details of a potential resolution, which defendant eventually rejected. Shortly afterwards, as the government prepared to seek an indictment in this case, federal investigators were able to access defendant's cell phone. They discovered significant new evidence, as described above. Based in large part on that newly discovered evidence, the government expanded the indictment to include Count 3, Aggravated Identity Theft in violation of 18 U.S.C. § 1028A(1). That count adds a mandatory consecutive 24-month sentence to any sentence defendant receives on the stalking and wire fraud counts. Since plea negotiations broke down, defendant's exposure has more than doubled from the proposed resolution that he previously rejected as unacceptable.

### III.     ARGUMENT

In light of defendant's history of stalking multiple victims, his persistence in doing so in spite of repeated police contact and state supervision, and the fact that he now faces both much stronger evidence and much harsher penalties for his conduct than he previously expected, defendant presents a serious risk of both flight and interference with AV1, the primary witness in this case. A detention hearing is therefore appropriate.  Additionally, no condition or combination of conditions can reasonably assure the safety of the community from this defendant, a technologically sophisticated recidivist sex offender who escalated his conduct in the instant case while on state supervision.

<u>A Detention Hearing is Appropriate</u>

Under 18 U.S.C. § 3142(f)(2), a detention hearing shall be held in a case that involves a serious risk that the defendant will either flee or attempt to threaten, injure or intimidate a potential witness.  This case presents a serious risk of both.

Defendant is a risk of flight because he has significant means, transferable skills, and a great deal to lose.  He purchased his house in 2022 for $1.5 million dollars, and has multiple family members who could liquidate and transfer assets to him should he choose to leave the country to avoid prosecution.  He is employed as a software engineering manager at a financial technology company, a field that lends itself to remote work.  And he faces a guidelines range of 30–37 months on the stalking charges, with a mandatory additional 24-month sentence for the aggravated identity theft, for a total of approximately five years in prison.  There is a serious risk that defendant, with his ample resources and opportunities, will choose to flee from prosecution rather than face the significant risk of five years of incarceration.

There is also a serious risk that defendant will attempt to threaten, injure, or intimidate AV1, the primary witness in this case. Defendant pursued a campaign of harassment and intimidation against AV1 for years, for no reason other than her previous romantic relationship with him. His obsession with AV1 is obvious from his persistent stalking and harassment of her, which was interrupted only by his incarceration for attempting to rape another young woman, whom he had also stalked. Once he was released from that sentence, despite his sex offender registration and his parole status, defendant immediately resumed and escalated his offense conduct towards AV1. He shared her full name, email address, general location, and nude images with innumerable strangers on the internet and encouraged them to send her pictures of themselves masturbating to her naked photos and to post them in her neighborhood. He also fraudulently obtained her legal documents and personal information, which he then used to send her an implied threat against her child. He did all this without provocation and with nothing to gain, and he stopped only while he was negotiating with the government to obtain a favorable outcome.

The government's offer, which defendant rejected as insufficiently lenient, is now revoked. Defendant has instead been indicted on charges that carry double the sentence he previously found unacceptable. And AV1 is the only witness who can testify to key elements of the government's case against him. If defendant is released after learning of the indictment, there is a serious risk that he will attempt to threaten, injure, or intimidate AV1 to prevent her from testifying, to punish her for her role in the government's case against him, or simply because he sees it as his last opportunity to torment her. This risk is not theoretical; defendant has already demonstrated that he knows AV1's general location, how to contact her, and the name of her child. Thanks to his technological proficiency and the ubiquity of Cloud storage services, defendant likely still has access to AV1's nude images and the full legal file from her divorce. He has demonstrated his

**Government's Memorandum on Detention**                                                                 **Page 9**

ability to impersonate her both to enlist strangers on the internet to harass and threaten her, and to obtain additional information about her through fraud. And he has also demonstrated his willingness to physically assault and attempt to harm women—like AV1—with whom he is sexually obsessed. The serious risk that defendant will flee or will attempt to threaten or harm AV1 necessitates a detention hearing. *See* 18 U.S.C. § 3142(f)(2).

<u>*No Combination of Conditions Can Assure the Safety of the Community*</u>

No condition or combination of conditions can reasonably assure that the community, and more specifically AV1 and other women, are safe from this offender. First, his conduct demonstrates a lack of remorse and a persistent sexual interest in victimizing innocent women. Defendant has been offending against AV1 for over a decade. Despite numerous opportunities to reflect on his conduct and change his behavior, he did not. Instead, he escalated. He found an additional victim and stalked her in person, prowling outside her home and peering in her windows while carrying duct tape and a ski mask. He then attacked her in person, breaking into her home while she slept and briefly incapacitating her with a blanket before fleeing the scene. As soon as he was released from prison in that case, he resumed his stalking of AV1, repeatedly posting her nude images on the internet while encouraging strange men to contact her, blackmail her, threaten her, and humiliate her in her own neighborhood. He then escalated again, fraudulently obtaining her legal file from her attorney and using the information it contained to contact her directly and implicitly threaten her child. Defendant's stalking of AV1 continued up until the very morning when federal agents executed a search warrant at his house. His persistent obsession with stalking and victimizing women makes him an unmitigable threat to the community.

Second, defendant has not been deterred by prior contacts with law enforcement or conditions of supervision. When police first stopped him for prowling at the victim's home in

2016, he waited for them to leave the area and then resumed his illegal activities, forcing them to return to the scene and contact him again. Despite being stopped by police on that occasion, defendant returned to the victim's apartment months later and assaulted her. While awaiting trial on those charges, he violated his pretrial conditions and California law by possessing a firearm and/or ammunition despite a court order prohibiting him from doing so. Even after being incarcerated for two years for his offense against the California victim, and despite being on parole and required to register as a sex offender, defendant resumed his stalking and harassment of AV1 shortly after being released. For two years while he was on parole, defendant illegally stalked AV1 and eventually defrauded her attorney in order to find new ways to threaten and scare her. No consequences or conditions of supervision deterred him from persisting and escalating in his illegal conduct, up until the day when federal agents executed a search warrant at his house. Any hope of negotiating a favorable resolution that may have incentivized defendant to pause his criminal conduct since the search has now been dispelled by the indictment in this case, which carries significant criminal penalties well beyond what was contemplated during pre-indictment negotiations. If released, defendant would be a danger to AV1 and to the community at large, just as he was a danger to AV1 and other women after he was stopped by police for prowling in 2016 and after he was released from state prison in 2019.

      No condition or combination of conditions can mitigate this risk. Even the strictest conditions of supervision rely on the defendant's good faith compliance in order to be effective. As detailed above, defendant's history demonstrates that he will not comply with conditions, nor will he be deterred from non-compliance by the threat of discovery and punishment. This is particularly true because defendant's technological expertise as a software engineer would enable him to use sophisticated methods to circumvent attempts to supervise him and to continue his online

harassment of AV1 and potentially other victims without detection. Under similar circumstances, other district courts have found that there is a serious risk that cyberstalking defendants will attempt to threaten or intimidate the victim and that no conditions of release can adequately protect the victim or the community. *See United States v. Waldman*, 1:18-mj-04701-UA (S.D.N.Y. June 12, 2018); *United States v. Harrison*, 354 F. Supp. 3d 270 (W.D.N.Y. 2018) (finding that pretrial detention was available because cyberstalking is a crime of violence, and that defendant was a danger to the community and the victim); *United States v. Yung*, 1:17-mj-00164-ML (W.D. Tex. Feb. 23, 2017). This Court should do the same.

### III.   CONCLUSION

There is a serious risk that defendant will flee and/or attempt to threaten or intimidate the victim if he is released, as he did for over a decade, and no conditions of release can adequately protect the victim or the community from his obsession with stalking and victimizing women. The government respectfully requests that the Court order that defendant remain in custody pending trial.

DATED: April 22, 2025.

Respectfully submitted,

WILLIAM M. NARUS
Acting United States Attorney

 */s/ Gregory R. Nyhus*
GREGORY R. NYHUS, ORB #913841
MIRA CHERNICK, MAB #696845
Assistant United States Attorney